Timothy S. Leiman (IL Bar No. 6270153)
Jake Schmidt (IL Bar No. 6270569)
Emily Rothblatt (IL Bar No. 6309226)
Attorneys for Plaintiff
**United States Securities and**
**Exchange Commission**
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
Telephone:  (312) 353-7390
Fax: (312) 353-7398
leimant@sec.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** ) ) ) | |
| Plaintiff, ) ) | Civil Action No. 20-cv- |
| v. ) ) | COMPLAINT |
| **GARY F. PRYOR,  ZIPREMIT, INC., and LENDAILY, INC.,** ) ) ) | |
| Defendants. ) | **Jury Demanded** |

_____


Dated this 14th day of September 2020.

_____ */s/ Timothy S. Leiman*
Timothy S. Leiman
Attorney for Plaintiff
**United States Securities**
**and Exchange Commission**

1.      This case stems from a $4.3 million offering fraud perpetrated by Defendant Gary Pryor through two companies under his control – Defendant ZipRemit, Inc. ("ZipRemit") and its sibling entity, Defendant Lendaily, Inc. ("Lendaily," both entities referred to collectively as the "Company").

2.      Pryor portrayed ZipRemit – and later Lendaily – as an up-and-coming player in the point-of-sale ("POS") credit industry. He claimed that the Company was developing software and securing financial backing to create a platform that would allow a retail customer to instantly obtain credit without a credit card at the point of sale. Pryor's business model hinged on the Company's ability to meet three threshold goals. The Company had to: (a) sign up major retailers so that their customers could use the Company's platform to apply for credit, (b) obtain third party financing so that the Company could actually extend credit (*i.e.*, lend money) to customers, and (c) develop software that could process customers' credit applications, check their credit rating, and approve (or deny) credit at the point of sale. The Company could earn revenue through fees and interest payments only if it met those objectives.

3.      Pryor recruited investors by telling them that the Company had met – or would soon meet – all of those critical goals. In presentations, private placement memoranda ("PPMs"), and letters to investors, Pryor boasted that the Company (a) already was earning interest and fee revenue from credit transactions, (b) was ready to "launch" its new software platform, (c) was finalizing contracts with a group of well-known retailers – which he called "mega clients" – including Keurig Coffee and Bridgestone/Firestone, and (d) had investment banks and "asset management partners" lined up to finance the underlying consumer credit transactions.

4.     Pryor's pitch was very successful. From 2013 to date, Pryor has raised over $4.3 million by selling stock and convertible promissory notes to investors. More than $2.9 million of that was raised since May 2015 alone.

5.     Unfortunately, Pryor's representations were false, and his Company – whether operating as ZipRemit or Lendaily – was a sham. In reality, the Company never earned any revenue from operations. It couldn't. The purported contracts with major retailers didn't exist and were never imminent. And, even if the Company had lined up willing retailers, the Company lacked the capital to finance the consumer debt transactions necessary to generate revenue. More fundamentally, the Company did not have a ready-to-deploy platform for processing credit applications. The software program at the heart of the Company's POS financing business model was in a state of perpetual development and never got past the testing phase.

6.     Rather than tell the truth, Pryor, ZipRemit, and Lendaily continued to raise money by lying to investors. They boasted of wildly unrealistic performance projections, merchant relationships that didn't exist, and milestones that were never achieved.

7.     All the while, Pryor was conducting an even more simple fraud: he raided the Company's coffers to fund his lavish lifestyle. Between 2015 and 2019 alone, Pryor took at least $1.2 million in investor cash and used it to pay for personal expenses, including: (a) $90,000 of private school tuition for his children, (b) $150,000 to pay off credit card bills, (c) over $60,000 to make payments on two luxury cars; and (d) $88,000 for memberships at an exclusive 135 year-old social club in Mid-town Manhattan and a tony invitation-only golf club in Phoenix.

8.     While Pryor enjoyed the money he misappropriated, investors lost almost

everything. The "interest" payments investors previously had received on their notes were illusory. Rather than make *bona fide* interest payments, Pryor used the core tool of a Ponzi scheme: he redirected almost $300,000 in new investor cash to pay fake "returns" to earlier investors. Those fake interest payments stopped by June 2019, leaving note investors with no income (let alone any prospect of getting their principal back). Meanwhile, equity investors were left with worthless stock in a Company that had (a) no marketable service to sell, (b) no revenue, (c) no retailers committed to use its services, and (d) a negative balance in its bank accounts.

9.     By engaging in the conduct described in this Complaint, Defendants Gary Pryor, ZipRemit, and Lendaily have engaged and – if not enjoined – will continue to engage in transactions, acts and practices, and courses of business that violate the antifraud provisions of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **JURISDICTION**

10.     The SEC brings this action under Securities Act Section 20(b) [15 U.S.C. § 77t(b)], and Exchange Act Sections 21(d) and (e) [15 U.S.C. §§ 78u(d) and 78u(e)].

11.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

12.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Many of the acts, practices, and courses of business underlying the alleged violations occurred within the jurisdiction of the United States District Court for the District of Arizona.

13.     During the alleged fraud described below, Defendant Pryor was a resident of Paradise Valley, Arizona. Defendants ZipRemit and Lendaily had their principal place of business in Arizona.

14.     Defendants directly and indirectly used the means and instruments of transportation and communication in interstate commerce in connection with the acts, practices, and courses of business alleged in this Complaint.

## DEFENDANTS

15.     **Gary F. Pryor,** age 60, is a resident of Paradise Valley, Arizona. From at least 2013 to the present, Pryor has been raising money from retail investors in connection with his efforts to launch a company specializing in merchant branded POS consumer finance. During the relevant period, Pryor was the CEO and Executive Chairman of ZipRemit and the CEO and a director of Lendaily. At all times relevant to this Complaint, Pryor had ultimate control over ZipRemit and Lendaily.

16.     **ZipRemit, Inc.,** was an Arizona corporation with its principal place of business in Arizona. ZipRemit was incorporated in 2012 under the name iPayMobil, Inc. ("iPayMobil"). iPayMobil changed its name to ZipRemit in November 2015. ZipRemit was administratively dissolved by the Arizona Corporation Commission in October 2018 for failing to file its required annual report. In November 2019, Pryor told investors that ZipRemit would be combined with Lendaily to create a new entity named Fintech Investments, Inc., although such a combination has not yet occurred. During the years it operated as iPayMobil and ZipRemit, the entity was controlled by Pryor and did not have any revenue from operations.

17.     **Lendaily, Inc.,** is a Delaware corporation with its principal place of business

in Arizona. Lendaily was incorporated on August 25, 2017. On January 30, 2018, ZipRemit acquired 30% of the shares of Lendaily. In March 2019, the Delaware Division of Corporations placed Lendaily in "void" status due to its failure to file an annual report and pay required taxes. In November 2019, Pryor told investors that Lendaily would be combined with ZipRemit to create a new entity named Fintech Investments, Inc., although such a combination has not yet occurred. During the years it operated as Lendaily, the entity was controlled by Pryor and did not have any revenue from operations.

## FACTUAL BACKGROUND

**Background of Pryor, ZipRemit, and Lendaily.**

18.     Gary Pryor bills himself as a serial entrepreneur. Over the past decade, he has started a string of business ventures, including: a promissory note offering that would generate returns by funding the construction of homes in Uganda, an investment group planning to buy a chain of Tex-Mex restaurants, a brokerage with insider access to historical Chinese bonds, and, in this case, a nascent POS consumer finance company poised to compete with the likes of PayPal and GE Capital.

19.     Some of those business ventures reflect a disturbing pattern. Pryor routinely raises money from investors based on a purported business plan and promises of substantial returns. Typically, Pryor's promises fail to materialize and the underlying business transactions never occur. And, Pryor routinely diverts investor funds for his personal use. Meanwhile, Pryor's investors are often left with worthless securities and no hope of recovering their principal.

20.     This is not the first time that Pryor's business ventures have led to fraud charges from the SEC. In September 2019, the SEC instituted a settled cease-and-desist

proceeding against Pryor and his company, The Pinnacle Companies LLC ("Pinnacle"), for defrauding two retail investors of over $1.1 million in connection with Pryor's sale of Chinese bonds that had been in default for almost a century. *In re Gary F. Pryor and The Pinnacle Companies, LLC*, No. 3-19540 (Sept. 27, 2019).

21.     This Complaint focuses on Pryor's fraudulent efforts -- from 2013 to the present -- to raise funds for his purported point-of-sale consumer credit company. The business model was straightforward. Pryor's Company would – like several other prominent payment systems – allow a customer at a store to obtain credit for a purchase without a credit card.

22.     Pryor told investors that the Company was developing software that would allow retail customers to apply for credit at the point of sale. The Company's software would quickly check the customer's credit rating, instantly approve (or reject) the customer's application, and provide financing for the transaction. The Company purportedly was in the process of (a) recruiting large retailers to gain access to customers needing credit, (b) obtaining third-party financing so the Company could extend credit to those customers, and (c) completing the software platform to process the customer credit applications. According to Pryor, the Company earned revenue from the fees and interest payments paid by the customer.

23.     As Pryor conceded in some of his investor presentations, this was not a novel service. According to Pryor's presentations, large, well-funded "mega" competitors such as PayPal and an offshoot of GE Capital provided similar POS credit services. Undeterred, Pryor told investors that the Company would distinguish itself from competitors by providing customer data to the underlying retailer so it could use the data for marketing

(presumably making the Company a more attractive partner for retailers).

24.     In October 2012, Pryor started the first iteration of the Company which he called iPayMobil. Over the next eight years, Pryor periodically "refreshed" the branding of the Company by changing its name. In November 2015, iPayMobil changed its name to ZipRemit. Then, in January 2018, Pryor announced that ZipRemit was a 30% owner of Lendaily and that all of ZipRemit's "lending activities" had been "rebranded" as Lendaily. Finally, in November 2019 – just two months after settling the SEC's fraud charges in *In re Gary F. Pryor and The Pinnacle Companies, LLC* – Pryor told investors that ZipRemit and Lendaily would be combined into one new entity, Fintech.

25.     At all times relevant to this Complaint, Pryor had ultimate control over the Company's operations and communications with investors.

26.     Pryor's periodic rebranding of the Company did not change the Company's purported business model, Pryor's control over the Company, or the nature of Pryor's fraud.

**Pryor, ZipRemit, and Lendaily Raise Money From Investors**.

27.     Pryor, ZipRemit, and Lendaily raised money from investors in two ways. First, in most instances, Pryor sold investors common stock in ZipRemit or Lendaily. From 2013 through 2019, Pryor sold at least 33 million shares of Company stock for at least $3.49 million. Second, in some cases, Pryor sold convertible promissory notes to investors that typically paid a 12.5% interest rate and were convertible into Company stock.

28.     The common stock and convertible promissory notes that Pryor, ZipRemit, and Lendaily sold to investors are all "securities" as defined in Section 2(a)(1) of the Securities Act.

29.     Between 2013 and 2019, Pryor, ZipRemit, and Lendaily solicited investors for

8

the Company in several ways. For each securities offering, Pryor drafted and distributed a PPM which described the nature of the offering, the Company's operations, and the Company's purported financial position.

30.     Often, Pryor met with prospective investors and presented a series of PowerPoint slides that he created. Like the PPM, Pryor's investor presentations described the Company's business model, purported operations, and financial projections.

31.     Pryor also drafted periodic "Investor Update" letters which he emailed to existing Company shareholders and noteholders. Those letters contained extensive descriptions of the Company's purported progress toward meeting various developmental goals. Although couched as mere "updates," these letters often expressly asked existing shareholders to invest more money in the Company and often attached materials related to the Company's ongoing stock and promissory note offerings.

32.     For each type of communication identified in ¶ 29-31, Pryor was ultimately responsible for the content and for communicating that content to investors.

33.     Pryor's written and oral communications to investors depicted the Company as an emerging success story that was well on its way to deploying a successful POS credit platform using an extensive network of established retailers. But, that image was an illusion. As described in detail below, Pryor made repeated, material false statements to investors to convince them to invest. Pryor falsely told investors that his company: (i) was already generating revenue or soon would be generating revenue; (ii) had executed contracts, or was in the final stages of contract execution, with multiple large merchants; (iii) had a point-of-sale consumer lending technology platform that had been fully tested and had already launched, or was within days or weeks of launching; and (iv) had already secured millions

of dollars in equity contributions from third parties to finance its planned lending activities. In reality, none of those critical goals had been met. In fact, ZipRemit and Lendaily never financed a single consumer purchase, nor did they ever have the capability to do so.

34.     From 2013 to the present – based on Pryor's misrepresentations – Pryor, ZipRemit, and Lendaily raised at least $4,317,960 from investors.

**Pryor, ZipRemit, and Lendaily Falsely Represent That The Company Is Earning Revenue From Operations**.

35.     To recruit prospective investors – and to convince existing investors to buy more stock – Pryor (through ZipRemit, and Lendaily) repeated a simple lie: that the Company was making money from operations.

36.     Initially, Pryor falsely told investors that the Company was earning revenue from loan origination and transaction fees.

37.     In a January 14, 2016 update letter to investors, Pryor perpetuated this misstatement by distinguishing how the Company currently makes money, from how it plans to make money in the future, stating: "We will purchase loan receivables that are generated from our merchant clients from our issuing bank. This is significant. Presently, we simply earn origination and transaction fees from these loans. Now, we can also earn the high interest rates generated from these loans."

38.     Pryor and ZipRemit's statement in ¶ 37 was false when made. At the time of that statement, the Company was not "presently" earning revenue from loan origination fees or any other source. In fact, it had never done so. Nor did it have the capital to purchase loan receivables—a necessary step to earn the "high interest rates" touted to investors.

39.     Similarly, in a December 2016 PowerPoint presentation which he distributed

to prospective and existing investors, Pryor misled investors by portraying the Company as having existing revenue streams. At the very beginning of the presentation, Pryor included the following slide prominently titled "How ZipRemit Makes Money":



40.    In that slide, Pryor and ZipRemit represented to investors that the Company "earns approx. 30 cents of gross interest [and] approx. 6 cents of net interest" on consumer debt, in addition to earning "origination fees from lenders" and "interchange fees from merchants."

41.    Once again, the statements in ¶ 39-40 were false when made. At the time of the presentation, the identified revenue streams did not exist. In fact, the Company had not even negotiated the terms of compensation with issuing banks and third-party lenders (let alone secured any "origination fees"). Likewise, except for one contract that had generated no revenue and was with an entity that did not have retail operations, the Company had not successfully negotiated any agreements with "participating merchants" (let alone established an agreed "interchange fee" with them).

42.     Over the next three years, Pryor consistently misled investors about the

Company's purported revenue. For example:

(a)  In a November 2017 presentation that Pryor created and distributed to investors,
     Pryor and ZipRemit represented that the Company had "multiple revenue
     streams," including "Origination/Interchange Fees," "Interest Revenue," and
     "Revenue earned from selling borrower applications to third party lenders"; and

(b)  In a January 2018 investor update that Pryor created and distributed to
     shareholders, Pryor and Lendaily represented that "2018 is our first major
     revenue year, as our loan origination systems are running effectively." Pryor and
     Lendaily reiterated that the Company's revenue streams included
     "Origination/Interchange fees," Administration fees," and "Interest revenue."

43.     The representations identified in ¶ 42 were false when made. At the time of

those representations, ZipRemit and Lendaily had never earned any revenue from

operations and had no "revenue streams." The Company had earned no

"origination/interchange fees," "administrative fees," or "interest revenue." Its "loan

origination systems" were not operational – and, therefore, we not "running effectively."

And, it had no loans to sell, let alone any "revenue earned from selling borrower

applications to third party lenders." In fact, ZipRemit and Lendaily never had capital to buy

any loan receivables—a necessary pre-condition to earn interest income or to sell the

receivable.

**Pryor, ZipRemit, and Lendaily Lie to Investors About Contracts With Merchants.**

44.     To further promote the Company, Pryor (through ZipRemit and Lendaily)

repeatedly told prospective and existing investors that certain large and successful retailers

had agreed to use his Company's POS platform. That lie was a key part of Pryor's effort to

portray the Company as an emerging success story. Those statements gave the appearance

that the Company would gain access to millions of potential customers and that revenues

would skyrocket.

45.     Specifically – in documents that Pryor drafted and distributed to investors – Pryor, ZipRemit, and Lendaily represented that the Company had executed agreements with several well-established retailers, at least five of which had annual sales exceeding one billion dollars. Pryor sometimes referred to these retailers as the Company's "mega clients." For example:

| DATE | DOCUMENT PRYOR GAVE TO INVESTORS | MISREPRESENTATIONS |
| --- | --- | --- |
| July 14, 2015 | Investor Update Letter | The Company is "proceeding… expeditiously" with the "facilitation of a line of credit" to Keurig (a leading coffee company that had over $4 billion in sales in 2015). |
| Sept. 9, 2015 | Investor Update Letter | The Company has "numerous merchant clients in multiple industries that range in size from national $ Billion+ revenue companies to emerging e-commerce retailers." |
| Oct. 2015 | Investor Presentation | The Company is "building relationships with," several "clients" including Keurig, Bridgestone/Firestone (a publicly traded, multinational tire manufacturer), Herbalife (a nutritional supplement company which had over $4 billion in net sales in 2015), and the University of Utah, among others. |
| Jan. 13, 2016 | Executive Summary Related to ZipRemit Stock Offering | The Company "has developed client relationships with at least five large (each with nearly $1 billion in sales / market cap) merchants who plan to commence consumer credit lending programs with us in 2016. Each of these mega clients is specifically focused on offering our revolving products." |
| June 2016 | PPM | The Company is launching its point-of-sale consumer finance product "with 5 major merchants each with 1 billion in sales." |
| June 2016 | Power Point Presentation to Prospective Investors | The Company had either executed contracts, or was in the advanced stages of finalizing contracts with Keurig, Bridgestone/Firestone, |

| | | Herbalife, and the University of Utah. |
|---|---|---|
| Aug. 2016 | Investor Presentation | The Company would launch with Keurig in Q4 2016. |

46.     All of the statements in ¶ 45 were false when made. Keurig, Bridgestone/Firestone, Herbalife, and the University of Utah were never "clients" – let alone "mega clients" – of ZipRemit or Lendaily. And, ZipRemit and Lendaily never executed contracts with any of those retailers.

47.     In fact, Bridgestone, Herbalife, and the University of Utah never even met with Pryor – or any other Company representative – to negotiate the substantive terms of a client relationship with the Company.

48.     Far from having an array of multi-national behemoths as clients, the Company, in reality, signed only one agreement with a third party merchant – a small, start-up healthcare technology firm ("Firm A"). And, that contract was the subject of repeated material misrepresentations as well.

49.     In November 2014, ZipRemit signed a "merchant services agreement" with Firm A – a startup that sought to provide its own technology platform to medical providers to help with medical charts and billing.

50.     When soliciting prospective investors, Pryor repeatedly referenced the Firm A contract. On multiple occasions, he falsely stated that the Company was on the verge of launching its POS Software Platform with Firm A. Pryor even told one investor that the Company successfully "soft launched" the POS Software Platform with Firm A.

51.     Pryor's statements related to the Firm A contract were false when made. In reality, the POS Software Platform was not fully developed, had never advanced beyond the

testing phase, and had never been used with Firm A or anyone else. The agreement with Firm A was set to begin on the "Go Live Date," which was defined as "the first date on which one or more Merchants are able to use the [POS Software Platform], which date is confirmed in writing by [the Company]." That date never came.

52.     The POS Software Platform never "went live" with Firm A or any other retailer. By early 2019 at the latest, Firm A had withdrawn from the agreement pursuant to a clause in the contract that permitted withdrawal based on the Company's "failure to provide a [POS Software Platform] which is suitable to [Firm A's] purposes."

**Pryor, ZipRemit, and Lendaily Falsely Tell Investors That the Company Was "Ready to Launch."**

53.     In addition to specific misrepresentations that the Company was on the verge of launching its product with Firm A, Pryor also made multiple general misrepresentations that the Company was about to "launch" its product into the market – often claiming that a launch was mere days or weeks away. The misrepresentations appeared in documents that Pryor drafted and distributed to investors. For example:

| DATE | DOCUMENT PRYOR GAVE TO INVESTORS | MISREPRESENTATIONS |
|------|----------------------------------|--------------------|
| Jan. 14, 2016 | Investor Update Letter | "We are pleased to announce that we will launch our revolving credit products with our merchant partners early in the second quarter of this year." |
| March 31, 2016 | Investor Update Letter | "It's time for launch! We are now ready to kick-off our consumer lending products this spring. Our back-end system is tested and approved and our initial merchant clients are ready to offer our revolving credit facility to their customers." |
| Jan. 2017 | Presentation to Existing and Prospective Investors | "Launching with [Keurig and Firm A] in the 1st Quarter of 2017." |

| Nov. 1, 2017 | Email to ZipRemit Shareholders | "[w]e are now a dynamic issuer of merchant centric consumer credit with frictionless processing of revolving and installment credit products." |
|---|---|---|
| Jan. 30, 2018 | Email Attaching Presentation re Note Offering for Lendaily | "2018 is our first major revenue year, as loan origination systems are running effectively." |

54.  The statements identified in ¶ 53 were false when made. Pryor's company was never on the verge of launching with Firm A, Keurig, or any other retailer. In reality, in the eight-year history of the Company, Pryor made only cursory efforts to develop the Company's POS software. He once hired a consultant to develop the POS Software Platform. But, in June 2018, Pryor stopped paying the consultant and, as a result, the POS Software Platform was never fully developed nor launched for consumer use.

**Pryor, ZipRemit, and Lendaily Lie To Investors About Purported Equity Contributions From Third Party Investors.**

55.  As mentioned above, Pryor (through ZipRemit and Lendaily) told investors that the Company earned high rates of interest on loan receivables resulting from the Company extending credit to consumers. For that to happen, the Company needed millions of dollars in capital so that it could extend credit itself or buy the loan receivable from the bank issuing the credit. Although the Company never obtained such financing, Pryor consistently made false and misleading statements to investors suggesting that the capital raises were about to be finalized, or had already occurred. The misrepresentations appeared in documents that Pryor drafted and distributed to investors. For example:

| DATE | DOCUMENT PRYOR GAVE TO INVESTORS | MISREPRESENTATIONS |
|---|---|---|
| Sept. 9, 2015 | Letter to Shareholders | "[W]e are still [in the] process of closing the following institutional rounds of capital…a PPM for $1,000,000 in common stock at $0.15 per share, exclusively for ZipRemit, Inc." |
| March 31, 2016 | Letter to Shareholders | ZipRemit has a "Soon-to-close capital raise of $5 million in common equity and up to $100 million of secured working capital." |
| Oct. 2016 | Letter to Shareholders | ZipRemit has "Engaged" an investment bank "to raise $53.5 million." |
| March 29, 2017 | Email to ZipRemit Investors | ZipRemit would "Continue to raise capital for our loan receivable buyback program" with the investment bank and "Asset management operating partner" that ZipRemit had purportedly retained. |
| July 2018 | Letter to Shareholders | Lendaily has (i) "finalized an agreement" with a third-party financial institution "for up to $50 million of 'lender to lender' debt finance, to allow us to purchase loan receivables" and (ii) "Engaged a major West coast, FINRA licensed investment bank … to raise $10 million in a Series B round of equity at a $50 million valuation. [The investment bank] will also raise $100 million in mezzanine and senior debt for LDRA." |

56.     The representations identified in ¶ 55 were false when made. Contrary to these representations, the licensed broker-dealers, and investment banks Pryor identified never solicited any investors – let alone raised any funds for Pryor or his entities. This is because Pryor never paid them. Nor did Pryor secure any of the above-mentioned sources of financing. In fact, other than the much smaller amounts Pryor raised from individual investors – much of which he took for himself (¶¶ 62-68 below) – Pryor failed to raise any

capital for ZipRemit or Lendaily.

**Defendants' Lies to Investors Were Material.**

57.    The misrepresentations identified in ¶¶ 36-37, 39-40, 42, 45, 50, 53, and 55 were – both individually and when considered together – material. The misrepresentations involved core aspects of the investment such as: (a) whether the Company had any revenue, (b) whether the Company had any retailers lined up to supply the Company's services to consumers, (c) the Company's ability to provide a working platform to process consumer credit applications, and (d) the Company's ability to obtain financing to extend credit in the first place.

58.    Reasonable investors making investment decisions would find it important – as part of the total mix of information available – that the Company, in reality, had  no revenue, did not have agreements with the Fortune 500 companies and other merchants that Pryor had identified, had no ability to "launch" its service in short order, and had failed to obtain outside financing.

**Pryor, ZipRemit, and Lendaily Acted With Scienter.**

59.    Defendant Pryor acted with scienter. At the time he made the representations identified in ¶¶ 36-37, 39-40, 42, 45, 50, 53, and 55 Pryor knew – or recklessly disregarded – that (a) the Company did not have any revenue from operations and did not have executed contracts that set the terms of purported "origination fees," the Company's share of "interest payments," or "interchange fees"; (b) the Company had not even met with, let alone started negotiations with, several of the "mega clients" that Pryor had touted to investors; (c) the one retailer contract that the Company had executed – with Firm A – had generated no revenue and had no near-term prospect of doing so; (d) the Company's POS Software

Platform was not ready to be deployed; and (e) the Company had not obtained financing (and financing was not imminent).

60.     And, as described below, at the time of the misrepresentations in ¶¶ 36-37, 39-40, 42, 45, 50, 53, and 55, Pryor knew that he was diverting a significant portion of investor assets for personal use.

61.     At all times relevant to this Complaint, Pryor was the CEO and Executive Chairman of ZipRemit and the CEO and a director of Lendaily. Pryor was acting in those capacities when he was raising money from investors on behalf of the Company and when he was making material misrepresentations to those investors. Pryor's scienter is attributable to both ZipRemit and Lendaily.

**Pryor Misappropriates Investor Funds and Makes Ponzi-like Payments to Cover His Tracks.**

62.     In the PPM sent to investors in connection with their investment in the common stock of the Company, Pryor, ZipRemit, and Lendaily represented that they would use investor proceeds to (a) "maintain and augment software," (b) "buy consumer loan receivables," and (c) "fund general, administrative, and marketing expenses, and operating debt and consideration payments."

63.     Similarly, the promissory notes that Pryor, ZipRemit, and Lendaily issued to investors represented that funds "will be utilized for business purposes only."

64.     Those offering materials did not indicate that Pryor could take substantial amounts of investors' cash to fund his lavish lifestyle. But, that's exactly what he did. Pryor used a significant portion of the money raised from investors – approximately $1.2 million since May 2015 alone – to pay for personal expenses rather than toward developing his business.

65.     Pryor commingled funds raised from investors in ZipRemit and Lendaily with $1.1 million in investor funds that he misappropriated in the offering fraud underlying the SEC's fraud claims in *In re Gary F. Pryor and The Pinnacle Companies, LLC*, No. 3-19540 (Sept. 27, 2019).

66.     Pryor then used at least $2.4 million in investor funds for his own benefit. Specifically, Pryor spent more than $980,000 on personal expenses, including:

(a) At least $90,000 in private school tuition for his children;

(b) Numerous luxury ski vacations in Telluride, Colorado;

(c) At least $23,000 paid to an exclusive, members-only club in mid-town Manhattan;

(d) At least $145,000 to make mortgage payments on his $1.2 million, 4,000 square foot home in Paradise Valley, Arizona;

(e) At least $150,000 in personal credit card payments;

(f) $65,000 in payments to an invitation-only private country club;

(g) At least $60,000 in payments for Audi's "flagship" A8 sedan and a Yukon Denali luxury SUV; and

(h) $850,000 transferred to bank accounts controlled by Pryor and his wife.

67.     Pryor also took $450,000 of investor cash to make a personal investment unrelated to ZipRemit or Lendaily.

68.     Pryor also used approximately $300,000 of investor funds to make purported "interest" payments on promissory notes held by earlier Company investors. These payments were, in practical effect, the type of payments seen in a Ponzi scheme: rather than make *bona fide* interest payments, Pryor, ZipRemit, and Lendaily used the investments from new investors to pay ersatz "returns" to earlier investors.

**Pryor's Scheme Unravels.**

69.     While Pryor used investor cash to pay for his luxurious lifestyle, investors were left with nothing.

70.     Eventually, Pryor, ZipRemit, and Lendaily ran out of new investor funds to pay interest to earlier note investors and Pryor's prolonged effort to create the illusion of success began to fall apart.

71.     By mid-2019, Pryor's fake "interest" payments on outstanding convertible promissory notes stopped. Investors have received no payments on the notes since June 2019. Neither ZipRemit nor Lendaily have funds in their primary bank accounts sufficient to continue interest payments – let alone to return investor principal.

72.     Equity investors also have been left with almost nothing. The Company has no paying clients, no sales revenue, and no finished POS product or service to deliver to clients even if it had them.

73.     And, even if the Company had a product or service ready to deliver, Pryor has left the Company with no funds to get its business off the ground. As of March 5, 2020, the primary bank accounts for both ZipRemit and Lendaily had negative balances.

74.     In sum, equity investors are left with an ownership interest in a company that has no product, no clients, no revenue, and no money in the bank.

**COUNT ONE**
**Violations of Section 10(b) of the Exchange Act,**
**and Exchange Act Rule 10b-5**

**(Against Defendants Pryor, ZipRemit, and Lendaily)**

75.     Paragraphs 1 through 74 are realleged and incorporated by reference.

76.     As more fully described in paragraphs 18 through 74 above, Defendants Pryor, ZipRemit, and Lendaily, in connection with the purchase and sale of securities, by

the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

77.     As described in more detail in paragraphs 18 through 74 above, Defendants Pryor, ZipRemit, and Lendaily acted with scienter in that they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent conduct identified above.

78.     By reason of the foregoing, Defendants Pryor, ZipRemit, and Lendaily violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT TWO

**For Violations of Section 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act
[15 U.S.C. § 77q(a)(1), 77q(a)(2) and 77q(a)(3)]
(Against Pryor, ZipRemit, and Lendaily)**

79.     The Commission realleges and incorporates by reference paragraphs 1 through 74.

80.     Pryor, ZipRemit, and Lendaily, in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (a) employed devices, schemes and artifices to defraud; (b) obtained money and property by means of untrue statements of material fact

and by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

81.     Pryor, ZipRemit, and Lendaily acted knowingly, or with extreme recklessness, in engaging in the fraudulent conduct described above.

82.     Pryor, ZipRemit, and Lendaily also acted negligently in engaging in the fraudulent conduct described above.

83.     By engaging in the conduct described above, Pryor, ZipRemit, and Lendaily violated Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

**RELIEF REQUESTED**

**WHEREFORE,** the Commission respectfully requests that this Court:

**I.**

Issue findings of fact and conclusions of law that defendants committed the violations charged and alleged herein.

**II.**

Enter an Order of Permanent Injunction restraining and enjoining Defendants Pryor, ZipRemit, and Lendaily, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15

23

U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## III.

Issue an Order requiring Defendants to disgorge the ill-gotten gains received as a result of the violations alleged in this Complaint, including prejudgment interest.

## IV.

With regard to the Defendants' violative acts, practices and courses of business set forth herein, issue an Order imposing upon defendants appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## V.

Issue an Order enjoining Defendant Pryor from directly or indirectly, including, but not limited to, through any entity owned or controlled by Pryor, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering.

## VI.

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other relief as this Court deems appropriate.

## JURY DEMAND

The Commission hereby requests a trial by jury.

Dated: September 14, 2020

Respectfully submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

*/s/ Timothy S. Leiman*
By:     One of its Attorneys

Timothy S. Leiman (IL Bar No. 6270153)
Jake Schmidt (IL Bar No. 6270569)
Emily Rothblatt (IL Bar No. 6309226)
**United States Securities and Exchange Commission**
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
Telephone:  (312) 353-7390
leimant@sec.gov